GUNDRUM, J.
¶1 Jacqueline Wise appeals from the circuit court's order affirming the Labor and Industry Review Commission's decision denying her worker's compensation claim. Because we conclude the circuit court erred in affirming the Commission's decision, we now reverse.
Background
¶2 In January 2013, Wise applied for a caregiver position with Grand Horizons Kimberly, LLC. On February 1, she underwent a pre-employment physical examination that included testing of mobility, balance, and weight lifting. The Grand Horizons' nurse who examined Wise noted no indications of pain, shortcomings in her performance of the tests, or anything abnormal. Grand Horizons hired Wise and she began work on February 10.
¶3 In the days that followed, Wise worked several shifts without incident. Her duties at Grand Horizons were like her duties at prior caregiving jobs she held, she would lift, bathe and reposition patients, turn them in bed, and assist them in getting up by using belts and squatting. According to Wise's uncontradicted testimony before the administrative law judge in this case, she had experienced no hip problems in performing these duties at her prior places of employment.
¶4 Wise further testified that near the end of her shift on February 17, she slipped on Grand Horizons' icy parking lot, her legs split apart, and she fell on her buttocks. She felt a "burning sensation and tingling" in her inner and outer thighs, as well as painful pressure in her groin area that radiated out to her lower back and hips. Although Wise was "hurting," she finished her shift. She then went home to rest and took over-the-counter pain medication. Wise worked her next shift, which began hours later, and she then had off from work for several days. Wise further testified that during this time, she had pain in her hips, inner thighs and lower back, though her hips and thighs hurt the most. Her next scheduled work day was February 22, but she did not go to work because she was "hurting, in pain," in the same areas of her body. She also did not work her scheduled shifts on February 23 and 24.
¶5 Instead, the morning of February 23, Wise went to the emergency room due to pain in her upper left leg. Notes from the visit indicate her "symptoms/episode began/occurred suddenly, 1 week(s) ago, and became worse 4 day(s) ago"; she "sustained Initially no pain but now has pain at left anterior proximal thigh/groin"; and she "[w]as okay first 3 days then pain began and has worsened," with her pain being "a '9' out of '10.' " Her pain was "aggravated by movement of left thigh. Is able to ambulate but with pain. Has slight low back discomfort." Though an x-ray of Wise's left hip was unremarkable, the examining doctor noted her left leg was "tender at left thigh proximal anterior medial aspect just inferior to the inguinal area" and Wise had pain with active and passive range of motion of the left hip. Wise was prescribed pain medication, provided a work release form, and discharged from the hospital with crutches to use and instructions to keep her weight off her left leg and ice the affected area. Records indicate Wise was to "limit activity" and could "return to work with restrictions" as of February 26.
¶6 On February 27, Wise saw Dr. Christopher Westra-the physician her Grand Horizons' supervisor asked her to see. Records from that visit indicate Wise noted "increasing symptomatology" and "dysfunction," specifically identifying two instances where her left leg "gave out," one while walking at Walmart on February 20 and the other while trying to put gas in her car on February 23. "At that point," records state, "she sought care in the emergency room.... She has continued to try to perform her usual activities without substantial improvement in her symptomatology." The records further indicate Wise "uses hydrocodone prescribed through the emergency room for her left hip pain." "On objective pain scoring, her pain right now is at an 8; at its worst it is a 10; at its best it is a seven.... She reports that nothing makes her pain better while movement of any kind makes her pain worse." "On musculoskeletal exam there is tenderness with gentle palpation of her left inguinal area. The tenderness is exacerbated with adduction ... and with external rotation of her left leg." "There is some accentuated pain behavior with grimacing at times. She does appear at times genuinely uncomfortable secondary to her left leg discomfort." Wise was assessed as having: "Left hip, groin injury," and she was given a prescription for a different pain medication. The records also indicate:
With regards to her activity she may lift up to 10 pounds; she may push or pull up to 15 pounds. She needs sure footing for all her activities; 80% of her activity needs to be in a sedentary activity that is sitting, 20% of her activity needs to be in light ambulation. All ambulation needs to occur at her own pace. She needs to experience improvement every 2 to 3 days or reevaluation is necessary.
¶7 Wise did not work between February 18 and March 1. On March 2, she went back to work, restricted to "light duty," but she was unable to complete her shift due to, according to her testimony, "excruciating pain" after she had delivered the mail to patients at Grand Horizons.
¶8 On March 4, Wise returned to the emergency room, indicating her pain was "10/10." Medical notes from that visit state:
Patient's pain was slowly getting better. She went back to light duty this past weekend and pain has worsened. She notes she is having to walk more than she is supposed to and that she is unable to tolerate the pain. She is done with the [pain medication] she was prescribed .... Patient denies other treatments. No other injuries. She follows-up on Friday, but cannot take the pain until then. She is supposed to work tomorrow.
The notes further indicate: "Extremities: grossly normal except as noted in the medial aspect of left thigh: pain, ROM: limited active range of motion, limited passive range of motion, limited active range of motion due to pain, limited passive range of motion due to pain." "Disposition" notes state Wise was given another prescription for pain medication, as well as a work release form, and indicate her "[p]roblem is an ongoing problem" and her "symptoms are unchanged." Other notes from the March 4 visit state that following her February 17 fall, Wise "had left groin pain at that time which slowly got better, however when [she] returned to work with 'light duty' restrictions the pain got much worse, states pain is still in left groin .... [Wise] [a]ppears uncomfortable ... [c]omplains of pain in left femoral area."
¶9 On March 7, Wise returned to the emergency room, again complaining of pain in her "left inner thigh" area and rating her pain at a 10. She received an injection for her pain.
¶10 On March 8, Wise saw Dr. Brian Harrison, who worked in the same office as Westra, to follow up on her prior appointment with Westra. The medical records from this visit indicate Wise complained of "severe pain and impaired ability to walk." Harrison observed that Wise
walked in a forward stooped, halting, antalgic gait, very short step on the left foot. By holding on [to] a counter she could demonstrate ability to rise on toes and on heels and squat about a quarter way down and arise. All of this though met with a lot of pain behavior. She professed inability to cross the left ankle over the right in a sitting position with the legs extended.
Wise was assessed with "[l]eft hip abductor and flexor strain," given a work note for sedentary duty, and prescribed pain medication.
¶11 On March 12, Wise, on referral from the March 4 emergency room doctor, saw orthopedic sports medicine physician Dr. Richard Canlas, who diagnosed her with "left anterior hip related to fall." He ordered an MRI, prescribed "modified weightbearing with crutches" and told Wise to modify her activity "to reach a tolerable level of symptoms." On March 14, Wise again attempted to return to light-duty work at Grand Horizons but left early. Wise saw Canlas again on March 15. An MRI conducted that day showed avascular necrosis of the femoral heads of both hips, a left hip joint effusion, and mild left trochanteric bursitis.
¶12 Canlas referred Wise to Dr. Kenneth Kleist, whom Wise saw on March 21. Records indicate Wise complained of "increased left hip pain since [her fall], and also some mild to moderate right hip pain." Kleist found "moderate to severe trochanteric bursitis" in Wise's right hip and could not examine her left hip due to significant pain. In addition to Wise's recent MRI and x-rays, Kleist reviewed a CT scan from eight months earlier (July 12, 2012), and concluded that the scan revealed "extensive patchy sclerosis of [Wise's] bilateral femoral heads, which could be consistent with evidence of avascular necrosis." Kleist took Wise "off work [for] the next month because at this point even sitting is extremely uncomfortable for her any time and standing is really not an option or doing the work she was doing." Kleist had Wise continue to use crutches so that she would be nonweight-bearing on the left side. Kleist wrote in the record that he explained to Wise that "even if we get this completely resolved the pain could recur as the avascular necrosis is likely more chronic and this injury is more an acute on chronic type injury. At some point, [Wise] could also develop collapse [and] the need for joint replacement."
¶13 Wise continued with conservative care and saw Kleist on April 18, May 8, June 5, and June 20, 2013. At her June 20 appointment, Wise reported "no improvement in her left hip pain" despite being "diligent about the lack of weightbearing." She also noted "increasing right hip pain," which she thought was from "protecting" and "not putting weight on" her left hip. Kleist noted that although Wise had been limiting her weight bearing for three months, her symptoms seemed to have worsened. Kleist ordered another MRI, which revealed:
Large areas of avascular necrosis in both femoral heads. There is more intense edema in the left femoral head and neck with a moderate left hip joint effusion which has worsened since the prior study from 3/15/2013. I also suspect that there is developing subchondral collapse in the superior aspect of the left femoral head.
Kleist performed a total left hip replacement on Wise in October 2013.
¶14 Subsequent to the left hip replacement, Wise's pain in her right hip increased. As a result, in January 2014, Kleist ordered another MRI. The MRI revealed "large avascular necrosis of the right femoral head demonstrating no significant subchondral collapse," "[s]table mild degenerative changes of the right hip joint," and "development of focal edema in medial aspect of the right acetabular roof with suspicious fracture line." Although the MRI was read as "no fracture or collapse," upon Kleist's review he saw "an area on the axial imaging where the head is out of round and there does appear to be cortical breakage." A staff radiologist agreed with Kleist's reading.
¶15 Wise's symptoms did not improve and Kleist performed a total right hip replacement on April 21, 2014. Wise was pleased with the results of her hip replacements, but she began experiencing low back pain. In June 2014, Kleist reported that Wise's "back still gives her trouble from time to time."
¶16 Wise began treatment for back pain. She saw Dr. Ryan Zantow, who reported that Wise's July 2014 x-rays of her lumbar spine "showed significant disk space narrowing at L5-S1, mild narrowing at L4-5, and lumbar spondylosis at the lowest 2 levels as well." Zantow also reviewed earlier x-rays from 2005 and 2008 which showed "early spurring at L5, narrowing at L5-S1 disk, and progression of the narrowing on the 2008 films." An MRI ordered by Zantow showed "disk desiccation and degenerative disk disease at L4-5 and particularly at L5-S1" as well as "some disk bulging." Wise underwent injections for her back pain and a nerve block but her condition did not improve. Zantow opined that Wise's back pain was "likely ... due in part to the mechanical issues at the hips and back from her previous [avascular necrosis ] and hip replacements." Similarly, Dr. Megan Kane, Wise's pain management doctor, opined that it was probable Wise's back-related disability was caused by Wise "trying to get back to normal activities after her second hip replacement surgery."
¶17 Wise filed a worker's compensation claim. In support of her claim, she offered the opinions of Kleist and Kane, as well as Dr. Jeffrey Gorelick, who examined her and reviewed her records. Grand Horizons offered the opinions of Dr. Randal Wojciehoski, who only reviewed Wise's records, and Dr. Alvin Krug, who examined Wise and reviewed records.
¶18 An evidentiary hearing was held before an ALJ who determined that Wise's work injury precipitated, aggravated, and accelerated her pre-existing left hip avascular necrosis beyond its normal progression requiring her to undergo left hip replacement surgery. He based this determination in part on the record evidence that demonstrated that, prior to Wise's fall on February 17, 2013, "her left hip was asymptomatic and fully functional." The ALJ recognized that "[p]rior to February 17, 2013, [Wise] had avascular necrosis in both hips," but noted that "[d]espite this preexisting condition, her hips were asymptomatic and the disease never caused her to seek treatment or lose time from work." The ALJ noted that Wise "passed [Grand Horizons'] preemployment physical exam. The examination checklist noted that [Wise's] knees, ankles, gait/walking, and balance were all normal, and that bending, squatting and lifting tests were also unremarkable. After the accident, however, [Wise's] left hip never returned to this baseline status."
¶19 The ALJ credited Kleist's opinion that Wise's fall "precipitated, aggravated and accelerated the preexisting avascular necrosis in [Wise's] left hip beyond normal progression," also noting that Gorelick agreed with Kleist and that Krug also opined that the accident aggravated the avascular necrosis in Wise's left hip. The ALJ rejected, however, Krug's opinion that the aggravation to Wise's left hip was "just ... temporary" and had resolved by March 4, 2013. The ALJ observed that "[i]n the month following the accident, [Wise] sought treatment for her injuries on seven occasions ... for intolerable left thigh/groin pain ranging from '8' to '10' on the pain scale," including treatment on March 7, 8, and 12, 2013, with an MRI being performed on March 15, 2013. The ALJ noted that on March 15, 2013, Canlas referred Wise to Kleist "for further care," and restricted Wise from all work. The ALJ concluded there was
absolutely no discernible improvement in [Wise's] condition on March 4, 2013 that proves her hip condition returned to its pre-accident baseline status; namely, a hip that was symptom-free and fully functional. In fact, the reason [Wise] was treated on March 4, 2013 in the emergency department was because her condition took a turn for the worse when she returned to work two days earlier. Even on light duty, [Wise] was "unable to tolerate the pain" and could not "take the pain" until her next scheduled appointment later that week.
The ALJ agreed with Gorelick "that but for the slip-and-fall accident, it is doubtful that the natural progression of [Wise's] preexisting avascular necrosis in the left hip would have necessitated surgery so soon." The ALJ noted that "following the accident, [Wise's] left hip was never symptom-free. The chain of symptoms and treatment from the date of injury to the date of surgery was unbroken."
¶20 The ALJ further determined that Wise's fall, combined with the increased stress put on her right hip while using crutches and "shifting her weight to the right hip to protect her left hip," precipitated, aggravated and accelerated her pre-existing right hip avascular necrosis beyond its normal progression resulting in the need for Wise's right hip replacement surgery. The ALJ additionally concluded that "[a]lthough [Wise] suffered from a preexisting degenerative disc disease in her low back, she had not experienced a flare-up of low back pain in almost four years prior to" her February 17, 2013 fall, and even the prior flare up "was triggered by an auto accident." The ALJ found that Wise's "hip injuries and surgeries caused by the accident of February 17, 2013 altered [Wise's] gait and balance which in turn precipitated, aggravated and accelerated [her] preexisting degenerative disc disease in her low back beyond normal progression." The ALJ awarded Wise corresponding benefits.
¶21 Grand Horizons petitioned the Commission for review of the ALJ's decision. The Commission determined that while Wise sustained an injury arising out of her employment with Grand Horizons, the injury only temporarily aggravated her pre-existing avascular necrosis. In its decision, the Commission noted that Kleist "consistently opined that the February 17, 2013 accidental event ... precipitated, aggravated, and accelerated a pre-existing degenerative condition, specifically avascular necrosis, beyond its normal progression, resulting in the need for bilateral hip replacement surgeries." The Commission also noted that Gorelick opined that "due to trauma to the bilateral hip joints and hip muscles caused by the intensely rapid abnormal abduction, blunt force was sustained with direct contact to the acetabular rim against a superior area of the femoral heads in joints which clearly had prior pathology due to preexisting avascular necrosis" and "[a]s a result of the fall, avascular necrosis pathology progressed rapidly, resulting in collapse of the left femoral head, which required total hip replacement surgery substantially sooner than may have otherwise been necessary."
¶22 The Commission, however, credited more heavily Krug's contrasting opinion that the "aggravation of [Wise's] avascular necrosis or left hip muscle strain from the slip-and-fall" was "temporary" and had "resolved without permanent disability or need for further treatment by March 4, 2013." The Commission viewed the issue as
whether the slip-and-fall incident caused only a sprain and temporary aggravation of her pre-existing avascular necrosis condition resulting in a brief period of temporary disability (as Dr. Krug opined) or whether it precipitated, aggravated, and accelerated [Wise's] pre-existing avascular necrosis condition beyond its normal progression resulting in the need for the hip replacement surgeries (as Drs. Gorelick and Kleist opined).
The Commission referenced Krug's opinion that
[i]t is likely and medically probable that [Wise] had a temporary aggravation of her pre-existing problem and/or a muscle strain as a result of her fall of 2/16/13. This likely resolved by 3/4/13 when [Wise] indicated that she had gotten better after resting her left hip area. [Wise] went on to have progressively increasing pain in her left hip and subsequent pain in her right hip, which are consistent with the natural history of her underlying personal problem of avascular necrosis.
¶23 The Commission determined the fall occurred as alleged by Wise but that it "caused only a sprain and temporary aggravation of her pre-existing avascular necrosis condition resulting in a brief period of temporary disability" from which she had "fully recovered" by March 4, 2013, as Krug opined. Specifically, the Commission noted that Wise
testified that she told her supervisor in the afternoon or early evening of February 17 that she was okay and would be able to work her shift that night, adding that later that evening she was only "in pain a little." [Wise] told [the ER doctor] on February 23, 2013 that she "[w]as okay the first 3 days." She told emergency room personnel on March 4, 2013, that her pain had been getting better. Further Dr. Kleist reported that a CT scan done in July 2012 before the slip-and-fall at work already showed the early stages of avascular necrosis, while the MRI done shortly after the slip-and-fall did not show any fracture or compression of the femoral heads.
(Citations omitted.) The Commission found Krug's medical opinion most credible and concluded that Wise's "worsening symptoms after March 4 ... were due to the underlying condition not the effect of the slip-and-fall." As to Wise's low back condition, the Commission determined that because it could not "conclude that the hip replacement surgeries were done as a consequence of the work injury," Wise did not "establish[ ] that her back complaints and disability are causally-related to that injury."
¶24 The Commission awarded $ 519.76 and $ 17.11 in reimbursement to Medicare and Medicaid, respectively, because of treatment expenses Wise incurred "to cure and treat the effects of the work injury through March 4, 2013," but it determined that neither additional medical reimbursement nor disability compensation was due. Wise sought judicial review of the Commission's decision, and the circuit court affirmed. Wise appeals.
Discussion
¶25 On appeal, we review the decision of the Commission and not that of the circuit court. Cargill Feed Div./Cargill Malt v. LIRC , 2010 WI App 115, ¶13, 329 Wis. 2d 206, 789 N.W.2d 326. Wise bore the burden before the Commission of proving the elements of her claim, and on appeal, she also bears the burden of showing that the Commission's decision should be overturned. See Kowalchuk v. LIRC , 2000 WI App 85, ¶8, 234 Wis. 2d 203, 610 N.W.2d 122. Wise asks us to overturn the Commission's decision on the basis that the record lacks sufficient credible evidence supporting its key determination that Wise's fall on February 17, 2013, resulted in only a temporary aggravation of her pre-existing avascular necrosis that had fully resolved by March 4, 2013.[1]
¶26 Whether Wise's accident precipitated, aggravated, or accelerated the normal progression of Wise's avascular necrosis is a question of fact. See Swiss Colony, Inc. v. LIRC , 72 Wis. 2d 46, 54, 56, 240 N.W.2d 128 (1976) ; UPS v. Lust , 208 Wis. 2d 306, 318, 321, 560 N.W.2d 301 (Ct. App. 1997). WISCONSIN STAT. § 102.23(6) (2015-16)[2] provides:
If the commission's order or award depends on any fact found by the commission, the court shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact. The court may, however, set aside the commission's order or award and remand the case to the commission if the commission's order or award depends on any material and controverted finding of fact that is not supported by credible and substantial evidence .
(Emphasis added.) Credible and substantial evidence is "relevant, credible, and probative evidence upon which reasonable persons could rely to reach a conclusion." Princess House, Inc. v. DILHR , 111 Wis. 2d 46, 54, 330 N.W.2d 169 (1983). We may consider the entire record when considering "whether or not evidence sought to be relied upon is so discredited as a matter of law by other uncontrovertible facts." Id . at 54-55. Here the Commission's order is dependent on the material and controverted finding of fact that by March 4, 2013, Wise had "fully recovered" from the aggravation to her left hip condition resulting from her February 17, 2013 fall. We agree with Wise that this finding of fact "is not supported by credible and substantial evidence." See § 102.23(6).
¶27 It is undisputed that the Commission found that Wise's "pre-existing avascular necrosis condition" was aggravated by her fall on February 17, 2013, which is why it awarded treatment expenses from the date of her fall through March 4, 2013. However, relying upon the report of Krug, the Commission concluded Wise had "fully recovered" from this aggravation by March 4, 2013. Krug's opinion relies on his stated belief that during a March 4, 2013 emergency room visit, "Wise indicated that she had gotten better after resting her hip." This is a clear misinterpretation of the record of that visit and the record evidence as a whole.
¶28 In its decision explaining its order, the Commission specifically relied upon the following from Krug's report:
It is likely and medically probable that [Wise] had a temporary aggravation of her pre-existing problem and/or a muscle strain as a result of her fall on 2/16/13. This likely resolved by 3/4/13 when [Wise] indicated that she had gotten better after resting her left hip area. [Wise] went on to have progressively increasing pain in her left hip and subsequent pain in her right hip, which are consistent with the natural history of her underlying personal problem of avascular necrosis of her hip.
(Emphasis added.) The Commission then added:
In response to specific narratives, Dr. Krug indicated that [Wise's] care following March 4, 2013, including her hip replacements, were not causally-related to any work injury, as the temporary aggravation of her avascular necrosis or left hip muscle strain from the slip-and-fall had resolved without permanent disability or need for further treatment by March 4, 2013.
Neither the record of Wise's March 4, 2013 ER visit nor the record evidence as a whole supports the conclusion that the aggravation of Wise's pre-existing avascular necrosis, which aggravation was indisputably caused by the February 17, 2013 fall, had resolved by March 4.
¶29 Neither the Commission nor Grand Horizons has identified any evidence in the record, and we are unable to find any, indicating Wise had any pain or physical limitations related to either of her hips prior to her February 17, 2013 fall. With that fall, she, as the Commission and Grand Horizons admit, sustained an injury that aggravated pre-existing avascular necrosis in her left hip.[3] Related to this injury, Wise missed several scheduled shifts at Grand Horizons and rested her hip. She went to the emergency room on February 23, where she indicated her pain was "a '9' out of '10,' " and the examining doctor noted her left leg was "tender at left thigh proximal anterior medial aspect just inferior to the inguinal area" and she had pain with active and passive range of motion of the left hip. She was prescribed pain medication, provided a work release form, given crutches, and instructed to keep her weight off her left leg and ice the affected area. Thereafter, Wise continued to rest her hip, utilized crutches, and shifted her weight to her right hip so as to avoid putting weight on her left hip, and took prescribed pain medication.
¶30 On February 27, Wise saw Westra, the doctor to whom Grand Horizons' directed her. Wise noted increasing pain and explained two episodes where her left leg "gave out." She indicated she used prescribed pain medication but her pain still varied from a 7/10 to a 10/10. Notes indicate that "[o]n musculoskeletal exam there is tenderness with gentle palpation on her left inguinal area. The tenderness is exacerbated with adduction ... and with external rotation of her left leg." She was assessed as having: "Left hip, groin injury," was restricted in activity, and was given a prescription for a different pain medication. On March 2, Wise attempted to go back to work, restricted to "light duty," but was unable to complete her shift due to the pain, which led her to return to the emergency room on March 4.
¶31 During that ER visit Wise indicated her pain was "10/10." The relevant notes from that visit state:
Patient's pain was slowly getting better . She went back to light duty this past weekend and pain has worsened . She notes she is having to walk more than she is supposed to and that she is unable to tolerate the pain. She is done with the [pain medication] she was prescribed .... Patient denies other treatments. No other injuries. She follows-up on Friday, but cannot take the pain until then. She is supposed to work tomorrow.
(Emphasis added.) Other notes from the March 4 visit state that following her February 17, 2013 fall, Wise "had left groin pain at that time which slowly got better , however when [she] returned to work with 'light duty' restrictions the pain got much worse , states pain is still in left groin.... [Wise] [a]ppears uncomfortable ... [c]omplains of pain in left femoral area." (Emphasis added.) The notes further indicate: "Extremities: grossly normal except as noted in the medial aspect of left thigh: pain, ROM: limited active range of motion, limited passive range of motion, limited active range of motion due to pain, limited passive range of motion due to pain." "Disposition" notes state Wise was given another prescription for pain medication, as well as a work release form, and indicate Wise's "[p]roblem is an ongoing problem" and that her "symptoms are unchanged."
¶32 On March 7, Wise returned to the ER, rated the pain in her "left inner thigh" as 10/10, and received an injection for her pain. On March 8, Wise saw Harrison, a doctor who worked in the same office as Westra, again, the doctor to whom Grand Horizons had referred her. The medical records from this visit indicate Wise complained of "severe pain and impaired ability to walk." Harrison observed that Wise
walked in a forward stooped, halting, antalgic gait, very short step on the left foot. By holding on [to] a counter she could demonstrate ability to rise on toes and on heels and squat about a quarter way down and arise. All of this though met with a lot of pain behavior. She professed inability to cross the left ankle over the right in a sitting position with the legs extended.
Wise was assessed with "[l]eft hip abductor and flexor strain," given a work note for sedentary duty, and prescribed pain medication.
¶33 On March 12, Wise saw Canlas, an orthopedic sports medicine physician, who diagnosed her with "left anterior hip related to fall." He ordered an MRI, prescribed "[m]odified weightbearing with crutches," and told Wise to modify her activity "to reach a tolerable level of symptoms." On March 14, Wise again attempted to return to light-duty work at Grand Horizons but left early. Wise saw Canlas again on March 15. An MRI conducted that day showed avascular necrosis of the femoral heads of both hips, a left hip joint effusion, and mild left trochanteric bursitis. Canlas instructed Wise to continue with her pain medication and that she was "unable to work" until cleared by the clinic. Medical records detail the subsequent months of medical treatment Wise underwent in relation to her left hip, right hip, and low back.
¶34 It defies logic, common sense, and the record for the Commission to determine Wise had "fully recovered" from the aggravation of her avascular necrosis on the same day she was treated in the emergency room after two days earlier attempting a light-duty shift which she could not finish due to pain in her hip. And as the ALJ correctly observed, the record shows that there was
absolutely no discernible improvement in [Wise's] condition on March 4, 2013 that proves her hip condition returned to its pre-accident baseline status; namely, a hip that was symptom-free and fully functional. In fact, the reason [Wise] was treated on March 4, 2013 in the emergency department was because her condition took a turn for the worse when she returned to work two days earlier. Even on light duty, [Wise] was "unable to tolerate the pain" and could not "take the pain" until her next scheduled appointment later that week.
As Wise notes in briefing, Krug's "conclusion that Wise's only injury was 'temporary aggravation' of her left hip is based on his nonmedical (mis)interpretation of a statement in a medical record." And the Commission erroneously based its order on this misinterpretation. As Wise further writes:
Nothing in [Krug's] report describes the physiological mechanism by which the accident caused a "temporary" (as opposed to ongoing) aggravation or how the aggravation supposedly resolved. He additionally fails to explain how Wise's symptomology-pain and deterioration of function-would have differed had the aggravation been (in his view) other than temporary.
¶35 It is beyond reason to conclude that even though Wise had no symptoms of any hip dysfunction or pain prior to her February 17, 2013 fall, passed her Grand Horizons medical exam without any issues two weeks prior to the fall, worked several shifts at Grand Horizons without problem in the days preceding the fall, and then experienced, to use the ALJ's phrase, the "unbroken" "chain" of significant pain and dysfunction from her February 17, 2013 fall until her left hip replacement surgery, that Wise had "fully recovered" by March 4, 2013, from the aggravation to her pre-existing avascular necrosis-which aggravation has been acknowledged by Krug, the Commission, and Grand Horizons. The Commission's key determination in this regard is not supported by credible and substantial evidence; there is no reading of the record which could reasonably lead the Commission to this finding.
¶36 As to Wise's right hip, perhaps due to his erroneous conclusion that the fall-related aggravation of Wise's left hip had resolved by March 4, 2013, Krug failed to address the effect upon Wise's right hip of her use of crutches and shift in weight from her left hip to her right hip in the months following her fall. In its "Memorandum Opinion," the Commission did not directly address Wise's right hip or the significant evidence that, as the ALJ found, pre-existing avascular necrosis in that hip was precipitated, aggravated and accelerated beyond its normal progression, and ultimately resulted in right-hip replacement surgery, by, at a minimum,[4] the course of treatment related to Wise's left hip, including doctor instructions that Wise place her weight more heavily upon her right hip in order to help (unsuccessfully) heal her left hip.
¶37 Perhaps because of its determination that Wise had "fully recovered" from the effects of the fall by March 4, 2013, the Commission failed to address whether Wise should be compensated, and in what amount, with regard to her right hip. Wise points to Jenkins v. Sabourin , 104 Wis. 2d 309, 311 N.W.2d 600 (1981), wherein our supreme court held that "the employer is liable for compensation payments for the subsequent injury sustained in the course of treating the compensable injury." See id. at 316. Jenkins is still good law, as the Commission acknowledged in the portion of its decision addressing Wise's low back, and the record appears to strongly indicate Wise's right hip condition was, at a minimum, precipitated, aggravated or accelerated by Wise, pursuant to doctor instructions, deliberately shifting her weight from her left hip to her right hip to make the left hip nonweight-bearing. Because we herein determine that the aggravation to the avascular necrosis in Wise's left hip did not resolve by March 4, 2013, upon remand the Commission shall determine appropriate compensation related to Wise's right hip.
¶38 Regarding Wise's low back, the record shows that Wise did have low back problems years prior to her February 17, 2013 fall. However, in its decision, the Commission acknowledged Kane's description regarding Wise's low back pain: "Low back pain gradual onset of discomfort and dull pain since trying to get back to normal activities after her second hip replacement surgery." The Commission recognized this as a statement that Wise's low back pain "occurred as a consequence of treatment for her hips." Citing Jenkins , 104 Wis. 2d at 316, the Commission then acknowledged that "[g]enerally, if an injured worker suffers an additional disability as a consequence of treatment for a work injury, the additional disability is compensable." The Commission, however, denied compensation for Wise's low back condition on the basis that Wise "ha[d] not established that her back complaints and disability are causally related" to her February 17, 2013 fall because the Commission "cannot conclude that the hip replacement surgeries were done as a consequence of the work injury." As detailed above, however, the Commission's determination in this latter regard was based upon its erroneous finding that as of March 4, 2013, Wise had "fully recovered" from the aggravation to her left hip indisputably caused by her February 17, 2013 fall. Upon remand the Commission shall also address appropriate compensation related to Wise's low back in light of the fact the aggravation to her left hip did not resolve by March 4, 2013.
Conclusion
¶39 As WIS. STAT. § 102.23(6) provides, the Commission's order may be set aside and the case remanded to the Commission if the order "depends on any material and controverted finding of fact that is not supported by credible and substantial evidence." Because we conclude that substantial and credible evidence does not support the Commission's key finding that Wise had "fully recovered" by March 4, 2013, from the February 17, 2013 aggravation to her pre-existing left hip condition, we reverse the circuit court's order affirming the Commission's decision, and we remand to the circuit court. The circuit court shall set aside the Commission's decision and remand the case to the Commission for further proceedings consistent with this opinion.
By the Court. -Order reversed and cause remanded.
Not recommended for publication in the official reports.

Wise also maintains that the Commission violated her right to due process when it reversed the decision of the ALJ without holding a credibility conference. Because we reverse and remand on other grounds, we need not address this issue. See Hegwood v. Town of Eagle Zoning Bd. of Appeals , 2013 WI App 118, ¶1 n.1, 351 Wis. 2d 196, 839 N.W.2d 111 (When the resolution of one issue is dispositive, we need not address other issues raised by the parties.).

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Like LIRC, however, Grand Horizons also maintains that the aggravation was only "temporary."

We say "at a minimum" because there is record evidence indicating Wise also may have directly injured her right hip during her fall of February 17, 2013.